We move to the second case this morning, Stapleton v. Advocate Health Care Network. Good morning, Your Honors. Mr. Kilgard, may it please the Court. My name is Amy Blaisdell and I represent the Advocate Appellants. This case is on interlocutory appeal pursuant to Rule 1292B from an order denying advocates' motion to dismiss, and the case involves the primary issue before the Court. How many cases of this around the country do you have? There are, I believe, 13 cases pending across the country. Advocate, the party that I represent, is one of 13 health organizations that are associated with the Church which are being sued. And there are two other cases that are going up on appeal, Your Honor. There's a case in the Ninth Circuit which is also going up. So this is an issue of significance, obviously, and the question is really whether a Church-associated organization like Advocate can establish a church plan. Just to give you a little brief background about Advocate, Advocate is a ministry of two churches, the United Church of Christ and the Evangelical Lutheran Church in America. Its predecessors were actually formed by a group of Lutheran deaconesses in a church that would eventually become the United Church of Christ. And today, more than 100 years later, those close associations persist. Advocate actually shares covenantal agreements with both of the churches in which they affirm their shared ministry to serve the health needs of the community, and Advocate is listed in both of the churches' annual yearbooks as a ministry of the church. Now, the parties agree that ERISA provides an exemption for a church plan as defined in ERISA, and so the question really is, does a plan established by a church-associated organization come within that definition found in Section 333? So I'd like to begin by walking through that statute briefly. Section 333A is the first part of the definition, and that provision states the term church plan means a plan established and maintained for its employees by a church or convention or association of churches. Now, if Subsection A were the only definitional provision, then plaintiffs would be correct that a church plan must be established by a church. And the plaintiffs rely heavily on the Burgess case for the proposition that if a definition says it means something, then it excludes anything else that is not stated. But Burgess also explained that when a definition uses the word includes, that that definition expands the meaning of the stated definition, and that's what we have in Subsection C1 of ERISA's definition. Okay, so it is true that the word includes can be a word of expansion, but it can also, it would seem to me, also be a word of clarification. For example, consider two sentences that might be given to the lawyers arguing cases before this court. The first, when you arrive at your argument, you will be appearing before a panel of Seventh Circuit judges. This might include a district court judge sitting by designation. Or, the second sentence, when you arrive at your argument, you will be appearing before a panel of Seventh Circuit judges. This might include a senior judge. In the first sentence, the word includes expands the definition of who can be on a panel in the Seventh Circuit. And in the second example, it clarifies who you might find on a panel of Seventh Circuit judges. So, must the word include always be a word of expansion? I would say the answer to that question is no. The word includes doesn't always replace an original definitional term like it does here. But, if I can go on to subsection C1, I think I can answer your question by example. So, C1 starts out by repeating the definition that is stated in A. So, A says the term church plan means plan established and maintained. C1 starts out by saying a plan established and maintained for its employees by a church or convention or association of churches includes. And everything after the word includes is the object of the sentence answering the question, what is included? And the answer is another type of plan. If C1 was intended only to be illustrative of is what your question is about, your honor, then rather than saying a plan established and maintained includes, the language would simply say a plan maintained includes a plan maintained by a C1 organization. But that's not what C1 says. It says a plan established and maintained, the exact definition in A, includes another type of plan. And that plan has its own requirements which are set forth in C1 and none of those requirements are that the plan be established by a church. Another way to look at the competing interpretations is to look at which argument assigns consistent meaning to the use of when the word includes as it's used in ERISA's definitional provisions. Advocates position and the long standing interpretation of the Internal Revenue Service does that. So, by example, in 333 C1, the use of the word includes expands the definition of the term church plan. It brings within that definition a plan that would not otherwise meet the definition of A. And then in 333 C2, use of the word includes does the same thing. It brings within the term employees of a church another group of individuals who would not be employees of a church, former employees, employees of a church associated tax exempt organization, and ministers regardless of who is compensating them. In subsection 332, the definition of the term governmental plan brings within that definition a plan of an Indian or tribal government that would not meet that definition. And in fact, there were cases... Yeah, forgive me, but in your brief, you referenced the governmental plan exemption being widened by the word includes to include non-governmental agencies, such as the railroad, the World Bank, tribal governments. But aren't each of these plans really plans associated with the government and as described in other proceedings included in the addendum to the Pepele's brief at ADD, what is it, 46? Actually, Your Honor, there was a case out of the Seventh Circuit with respect to an Indian tribal government that held that a plan established and maintained by an Indian tribal government was not actually within the governmental plan definition. And the amendment, a 2006 amendment to the governmental plan definition expanded that definition using the word includes to add a plan established and maintained by the government or by an Indian tribal government. Does this language include interpretation of actions by the church? In other words, is the government attempting to define what the church means when they say something? Are you getting to the constitutional question? So, yes, Your Honor. That goes to the second issue, which is the issue of constitutional avoidance. And it also brings in the legislative history and the agency deference. So I'll try to address all of those at the same time. So... Are you going to do that now or are you going to go back? I can... Judge Robert, I want you to go back and finish that slide. Okay. Go ahead as you were proceeding with her. Okay. I'm sorry. Go ahead, Your Honor. Okay, here's my problem. The statute states that a church plan must be established and does not establish the plan at issue. It's true, of course, that the statute was amended in 1980 to permit church plans to be maintained by principal purpose entities and to include the employees of those entities. But the text still requires that the plan be established by a church. And I am trying and I've been trying to figure out why doesn't that end? Okay, Your Honor. In the appendix, page 7 of... Actually, page 7 of appellant's addendum is part of the legislative history. And plaintiff's appellees have argued, and the district court adopted this argument, that the legislative history reflected that the purpose of the amendment was only to allow this principal purpose organization, often called a pension board in the legislative history, to maintain a plan. That's their argument. But that is not all that Congress was concerned about. And appellees have conveniently not cited at all to this part of the legislative history. It says on addendum 7... No, no. They, you know, look, it seems clear from the legislative history, as you pointed out in your brief, that some members of Congress and the Treasury wanted to ensure that those who work for religious schools and other entities could continue to be covered by the affiliated church's benefit plan after the sunset provision. But this still does not address, you know, call me doctrinaire, I don't know. This doesn't address the question of whether the church itself has to establish the plan. I can't get past that. And it doesn't. The legislative, part of the legislative history that I want to read to you is talking about the inapplicability of the pre-1980 definition to certain denominations. And it says, most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from but controlled by the denomination. Under the church plan definition, the old definition, the 1974 definition, there is a question whether a plan is established by a church, as it must be, or by a pension board. This requirement also points up the inapplicability of the church plan definition to congregational churches. So in the legislative history, they're saying some of these pension boards establish their own plans and therefore they wouldn't meet this definition, and therefore the definition is not well suited for these churches. And on the next page, Addendum 8, the legislative history goes on and it says, a plan or program funded or administered through a pension board, whether a civil law corporation or otherwise, and that language was later expanded to an organization whether a civil law corporation or otherwise, will be considered a church plan provided the principle, purpose, or function of the pension board is the administration or funding of a plan or program for the provision of welfare or retirement benefits and provided it's controlled by or associated with the church. There's no provided that it's established by the church. So the district court in Appalachia took a narrow reading of the legislative history, but the fact that C1 doesn't say established by a church leaves, means that there is no requirement that the plan be established by a church. Go ahead. So I guess one other way that, let's see, I want to talk briefly about the role of the legislative history, which I've done. Nowhere does it say that a church plan must be established by a church, and instead it underscores the fact that the whole point of the exemption, the whole point of the amendment was to broaden the definition of the term church plan so that it was well suited to both congregational churches and hierarchical churches. And if the court determines that there is an ambiguity, and certainly reasonable minds can differ here, right, because we've got six district courts split three on each side, then the better source of guidance is the 30-plus years of agency interpretation, which the district court really dismissed without basically saying that it's inconsistent with what I've concluded here, and therefore it's not well-reasoned, it's not entitled to deference. But that fails to take into account the fact that the Department of Labor enforces Title I of ERISA, and the IRS enforces Title II of ERISA, and the Pension Benefit Guarantee Corporation enforces Title IV of ERISA. And all of those agencies have said, we're going to look to how the IRS interprets ERISA, and if you're a religiously affiliated organization and you want to know if you're a church plan, you go to the IRS and get a private letter ruling, which, oh, by the way, Advocate and 500 other organizations have done, and the IRS has concluded that a church-associated organization can establish a church plan. You're in your rebuttal time, you know. Oh. Go ahead. I'll go ahead and stop here and come back. You can do whatever you want. Let me go through the one point I want to make before sitting down, is that Treasury was intimately involved in the legislative process in 1980. It was Treasury that issued a proposed regulation in 1977 purporting to define when activities would be considered sufficiently religious to qualify as a church, and that was a regulation for churches, for church-associated organizations and agencies. And in September of 77, the IRS interpreted that statute for the regulation for the first time, and it held that a plan established by a religious order was not a church plan because it wasn't performing functions that were integral to the church. And that resulted in a whole bunch of churches lobbying and objecting to the government defining what parts of religion were integral to a church and not integral to a church, and they formed an alliance to amend ERISA, to get rid of this issue. And in 1980, Dan Halperin, the Assistant Deputy Secretary of Treasury, testified at the Senate Finance Committee hearing, and he said, we don't want this amendment. The big problem we have with it is that it's going to allow individuals who happen to work for a hospital or school that's affiliated with a church to be exempt under this church plan definition, and we disagree with that. Nevertheless, the amendment passed, and a year and a half later, after the amendment was passed, the PBGC told the same religious order who wanted to make some changes to its plan, go back and get another ruling from the IRS to determine if your plans are church plans. And the IRS realized that it had been legislatively overruled, and it determined that the plan of a church-associated organization, the religious order, no longer hinged on whether a church established the plan and that under C-1, the equivalent of C-1, that that order could sponsor a church plan. I'll rest on that for now. Mr. Kielgard? Good morning, Your Honor. And good morning, Ms. Blaisdell and other defense counsel who are with us from some of the other cases. Are there any updates on the cases pending before the Third, Sixth, and Ninth Circuits? Sure, Your Honor. In the Third Circuits, the briefing is complete on the 1292B appeal. It will be argued next month. In fact, it will be argued by Karen Handorf, sitting at counsel table, who is here with me. As to the Ninth Circuit, I'm from Arizona. As you may know, things tend to go a little slower out west. We are just completing the briefing. The reply brief hasn't been filed yet. And unfortunately, our experience in the Ninth Circuit is oral argument will not be for some time. As to the other cases, Ascension- But it might be in Hawaii. Well, that's true. Hawaii, Pasadena. As to the other cases, Your Honor, one of them, Ascension, in the Sixth Circuit, settled yesterday. The cases that are in this Northern District of Illinois, two of them present since St. Anthony's, are stayed pending this court's decision. CHE in the Third Circuit is stayed pending the St. Peter's decision. Providence, I hope I'm getting this all right. This is like remembering the names of all your children. Providence in Seattle is stayed pending dignity. The cases that are being actively litigated are CHI in Denver and Trinity in Maryland. Let me ask you something to start you off. Sure, please do. What if the Catholic Church's pension plan was established by a pension board from the get-go and not by the Church? Would this mean that it could never take advantage of ERISA exemptions, even when applied to priests of the Church? Well, that is a bit out of the box. In 74 and in 80, the statute requires established and maintained. In the 78 version, the C1 provision that Ms. Boyce-Dole is discussing, originally said a plan established and maintained by a church includes a plan established and maintained by a dot, dot, dot, pension board. That was eliminated. So established and maintained by a church includes a plan maintained by a pension board. If a church, a true church, you know, the Diocese of whatever, were to establish its plan through the interposition of a pension board, I guess, Your Honor, the issue would be did the church nevertheless establish it simply through this corporate interposition? The reason I put it that way is before 74, after 74, the churches, plenty of churches were using what the legislative history calls pension boards. The 1980 amendment was to clarify that that's okay. What you've been doing is okay. So I don't, the, all the discussion is about the fact that the pension boards maintain the plans, not that the pension boards establish the plans. The true church plans that I've seen, I mean, we obviously do a lot of litigation like this, Your Honor. The true church plans that I've seen, for example, the ELCA, Church Plan for Priests, the Episcopal Church USA, Church Plan for Priests, are quite plainly established by the church and then maintained by the board of pensions of the ELCA or the board of pensions of the Episcopal Church USA. I'm not, I'm not quite sure I got at your question, Your Honor, but that's my best shot at it. Thank you. I would, I'd like to spend my time also, more or less like Ms. Blaisdell, focusing on this statute. But boy, I would sure like to get to a little bit of the legislative history because this is, this is not a case where you have the policy of the statute, the legislative history, and then what ends up in the United States Code, and you're trying to reconcile them all. It all fits together like a watch. Indeed, in my original remarks here, I just wanted to tell the story chronologically, but recognizing that the statute is where we start, I'm going to start with the statute. Judge Chang, like Judge Henderson in San Francisco, like Judge Shipp in New Jersey, by implication, like Judge Jones in Philadelphia, and also, for that matter, like Magistrate Judge Mix in Colorado, got it right. Only a church can establish a church plan. The, if we start with the statute itself, which is in, it's pages two and three of the addendum to the answering brief, I'd like to look at it this way. Three things. Who, who can establish a church plan? Who can be in a church plan? Who maintains a church plan? Who can establish a church plan? There's only one part of this statute, now three times as long as the 74 statute, that addresses that. A church plan means a plan established and maintained by a church. Nowhere else is there a word about who can establish a church plan. Who can be in a church plan? I'm happy for the opportunity to talk to you directly, because although this is in the briefs, it's a little bit tricky and a little bit of an Arisa Geek issue. Who can be in a church plan? Section A says a church plan means a plan established and maintained for its employees by a church. So who are these employees? You skip down to C2 and C3 for this odd sort of circumlocution that the employees of a church include employees of an organization controlled by, associated with. And then the next section, oddly, says the church is deemed the employer of those people. If you weren't spending more time in Arisa than you wanted to, like most of us are, it might go past you that that's there because Arisa is an employer-employee statute. These people who work for the organization controlled by or associated with, what are called agencies in the 74 statute, they don't work for the church. So if the benefits are coming from the church, it doesn't line up with the definition of an employee benefit plan under Arisa. And it also doesn't line up under the tax code, under 401A. In order to get the tax qualification, it has to be an employer-employee relationship. So this language- Yes, Your Honor. Do you know of any examples in which it appears as though the association between the church and the church-affiliated entity was motivated only or primarily as a way to skirt Arisa requirements? Let me take a crack at that and see if I'm answering it, Your Honor. As those of us working on these cases on the plaintiff's side understand the narrative, the church plan exemption was, in truth, a narrow exemption for churches for years and years. And it covered, the church plan covered, church agencies. Judge, not judge, Senator Talmadge, for example, and I haven't forgotten your question, Your Honor. I may be going a little slow. That's okay. Judge Talmadge, judge, why do I keep saying that? Senator Talmadge was explaining why agencies need to be in a church plan. This is in opening brief addendum 12. He said ministers and lay employees have a unique need to be covered by one plan. Why? Because if a business incurs increased plan maintenance costs, it merely passes them on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the additional costs of complying with Arisa. Those were the agencies that the Congress had in mind, small hospitals, parochial schools, small publishing houses. What has happened, and to circle back to your question as best I can, Your Honor, is that benefits consultants over the last, oh, I don't know, 10 or 15 years, increasingly spotted this argument, the argument that's being made to you, as a way that large commercial operations, all 10, we represent 10, we're in 10 cases, Your Honor, Karens and my firm. They're all large hospital chains. Benefits consultants spotted the issue, spotted that they could get PBGC refunds of insurance, and persuaded management, here's a way to save money and to avoid the cost of federal regulation. So that impetus, Your Honor, did not come, as far as I'm aware, from any church. It came from commercial benefits consultants who, I'm not faulting them, I mean, they were doing their job, looking out for ways to save their clients money, and they spotted one. Arisa compliance, it is true. It does cost money. You have to pay insurance. You have to fund it currently. You have to make sure you have the vesting schedules. You have to send out... Isn't there a broader thing, in many cases, the churches want to make sure there is health care available through hospitals, and if they didn't reduce costs, the hospitals might not exist. A hospital, for example. Well, that's true, Your Honor. Although, in a case like this, and there are other cases, these are multi-billion dollar organizations. The CEO of this company has a... But there are also, there's that example, but there are plenty of other associations... And as to those, Your Honor, as to those examples, that is what the statute was designed for. Those hospitals should be included in the church's plan. That's absolutely fine. That's the way it was in 1974. And Ms. Blaisdell is right, that in 1980, the churches, through the church alliance, wanted to continue. It was going to end in 1982. The cutoff was 82. And what Dan Halprin was describing, we know Dan Halprin quite well. He's an expert in one of our cases. But he was describing, when he testified for Treasury, was Treasury didn't want these agency plans in the church plan. They didn't even want that. They thought that wasn't enough protection. But Treasury lost on that. The Congress agreed agencies could stay in the church plans. But nobody, nobody suggested that an agency, much less an agency like Advocate, could establish its own church plan, avoid the cost of compliance, have an advantage over its nonprofit competitors, who are paying PBGC insurance, are currently funding, et cetera. Your Honors, as so often is the case, I've sort of lost the train of my thought in the middle of this. Let me, let, we talked about two things in the statute. Who can establish a plan? Who can be in a plan? And the reason I emphasize that is, that was the over, I mean, in the legislative history, which is in the addendum to your briefs, you know, in truth, it's not very extensive. There is, there's a speech by Conable in the House in 78, another one by Talmadge. They say the same thing. Talmadge gives the same speech in 1980. If you look at those, I actually brought them, brought them with me. You'll see over and over, if we don't do this in 1982, they're going to have to split their plans in half. They're going to have to plan for the church, plan for the employees. So the 1980 statute, that was the 90% of the thrust up. The pension board issue was a clarifying footnote. So to turn to that third issue, who can maintain a church plan? That's what's addressed in C1. That's all it addresses. Your Honor, your questions to Ms. Blaisdell are, they are exactly the types of things I wanted to address, this business of includes. As I read the briefs over in my hotel room, it wasn't so much a question of disagreement as of two ships passing in the night. As a matter, if reading a statute were a matter of set theory, set theory, then the way this is drafted, C1 expands the description of church plans in A, because it includes plans maintained by this other entity. But if it's read as a matter of English, of constituents wanting the Congress to fix something for them, it merely clarifies that those church plans we've been talking about and that we have had for 100 years in some denominations, it's all right if the church maintains them through this interposition, even if it's a separate corporation. Indeed, Senator Talmadge, who is, there isn't a lot of legislative history on the pension board issue because it was not as important, but, let's see if I can, yes, here it is. This is an opening brief, Addendum 16. Talmadge says the legislation, quote, the definition would also be expanded to include church plans, which rather than being maintained directly by a church are instead maintained by a pension board, maintained by a church. So there you have a version of it as being expanded. If you flip over to answering brief A.D., Addendum 70, answering brief A.D. 5, answering brief A.D. 13, you'll see the same issue being described both by Talmadge and Conable as there is a question whether it's permissible to maintain it by a pension board. There is a question where Conable says it is not clear. So the same thing is being done, whether includes, this incredibly loaded word includes, is viewed as expanding, explanatory, clarifying, and that's true elsewhere in ERISA, Your Honors. For example, for ERISA lawyers, the main definition you look at is the definition of fiduciary in 321. It's this elaborate description of the type of person, what that person has to do to be a fiduciary. The definition then says a fiduciary includes somebody else, a person described in Section 405 of ERISA. Well, I suppose you could argue it either way, but probably that 405 person is not included technically in the definition in 321. Your Honor, discuss the governmental plan issue where you have a similar thing. I mean, my favorite example is just state. State includes Wake Island. Well, no, it doesn't. I mean, no one thinks state includes Wake Island in the canal zone, but it's permissible if you're writing a statute to get your point across where the statute is going to work to write it that way. So we've talked about the statute, those three issues, who can establish it, who can be in it, who can maintain it. The defense argument in this and other cases is that C1, that buried in C1 is an exception to the establishment requirement, that it's like a kind of wormhole. There are two responses to this really. One is common sense. The other are the various statutory doctrines that, at least as I understand them, amount to canons of construction that try to tie down common sense. The common sense response is what the statute describes in Section A, what a church plan is, what it means, and it has to be established by a church. They are called church plans, after all. C1 is about a detail of the management of church plans. It's about the way they have been managed forever. Of course, church plan itself is a, it's not, it doesn't say religious plan, it says church plan. That is puzzling, isn't it, Your Honor? I mean, when I first got into this and I was at a seminar recently with the transaction arisotypes and most of the questions were about what are you talking about? It doesn't cover synagogues. It doesn't cover mosques. But that's how the Congress did it in 1974. They haven't changed it, of course. There is this 14-factor test that the IRS uses to determine whether something is a church or not. None of that has anything to do with Christianity, even though in common parlance you usually, you know, your Jewish friends you don't normally think are going to church. You think they're going to temple. You know, you argue that advocate is not controlled by or associated with the church. What do you think the indicia are that would establish control or association? What do I think those terms mean? No, what do you think the indicia are that would establish control? Oh, of course. Or association. Right. Control isn't defined in the statute, unfortunately. So our view and the view we've used in other cases with expert witnesses is that it's a corporate control doctrine. Whatever the entity is for a state law nonprofit is usually what these are. It is controlled by whatever the mechanism is state law describes, usually by majority shareholders. If it's a nonprofit, by a member. As to associated, it's a little different. The statute does define that. But that just, sharing common religious bonds and convictions, but then that just opens another door. The two appellate cases that describe that, Lown and Chronister, conclude that the Baptist hospital there, though it called itself Baptist, was not even associated with the Southern Baptist Convention because it's a three-factor. Well, sometimes it seems like everything is a three-factor test. I mean, there was no financial support. There was no denominational requirement. I'm not even sure I remember the other one here. Your Honor, my time is up. It's been a great pleasure. If Judge Rovner has anything else, go ahead. Judge Rovner wants to leave now. All right. All right. Thank you very much. Thank you very much. Thank you very much. No, I didn't mean that. I didn't mean that. A couple minutes. So to address one point that I didn't get to earlier, the issue of constitutional avoidance. As I started to say, the district court's order resurrects the same constitutional issues that Congress was talking about when it amended the church plan definition in 1980, and specifically that was the church, the government interfering in defining which activities were integral to a church. And second, the differences in treatment among religious denominations. And again, I would direct you back to Addendum 7 and 8 of Appellant's Addendum, where it does in fact talk about the fact that these congregational churches were, pension boards were establishing their own plans. And we have Amicus Guidestone also explaining that pension boards established their own plans and the IRS recognizing that that's okay. I feel bad sort of taking some of your rebuttal time, but maybe. Please go ahead. Maybe Judge Kenney will give you an extra minute. But how would it cause entanglement if the government were to say to advocate, look, you have to follow the same rules of ERISA as everyone else. You have to protect your funds. You have to pay into insurance. How is that any different from the government requiring the hospital to comply with OSHA, for example? Well, Advocate is a religious organization, and it has, you know, as part of its mission, having funds set aside to heal and to fulfill its ministry. And as the Supreme Court said in Amos, if the government comes in and starts questioning which activities of Advocates are sufficiently enough to be part of their mission, then that is unconstitutional. That is a violation of Advocates' constitutional rights. And so in this case where ERISA might say, you have to follow these certain investment criteria, and Advocates' investment philosophy says we can't invest in these certain types of investments because of our religious beliefs, that would cause problems for Advocate. But it's not really what happens as opposed to Advocate. It's what was the purpose of the amendment in the first place, and the purpose was clearly to avoid governmental interference. And the second, is there a purpose or effect of advancing religion? And as the Supreme Court said in Amos, it does not have the purpose or effect of advancing religion to allow religious activity to exist. And third, is the government unnecessarily entangling itself with religion? And here it doesn't, because the government is saying, you're a religious institution, you responsibly manage your own funds, and we're going to stay out of it. And Advocate and the church plan exemption are one of five exemptions, as we've said in our brief, to ERISA. So it's not like there was just an exemption for churches or religious organizations, and in fact, following Waltz, when the church plan exemption was extended to religious organizations and other charitable organizations, it moved further away from that wall between separation of church and state. You used an example of something that you might be required to invest in that might be in violation of religious beliefs. Can you give me an example? Well, you know, if Advocate supports U.S. labor and their investments and investing in certain international things that would yield a better return but wouldn't be consistent with its philosophy, something along those lines. I thought you were going to say something like escort services. Well, yes, that too, since that's been in the news lately. A couple of final points. The fact that plaintiff's argument has rarely been raised in 30 years suggests that it's not the best and the most logical interpretation. Sure, you know, there are obviously two positions that can be taken, but the position that they've taken is not the view of the IRS, which was integrally involved in the amendment process. And I would urge the court to look back at the United States versus Davis because this case really fits squarely inside of that case in terms of the IRS's involvement, the initial interpretation, the involvement in the legislative process, the interpretation afterwards, and the deference that the courts gave to it thereafter. So if there are no other questions. Thank you. Thank you. Thanks to both counsel. The case will be taken under advisement.